We'll hear the next case, Holland Loader v. F.L. Smith. Good morning, Your Honors. May it please the Court. Mike Orella for Plaintiff Appellant, Holland Loader. The lower court held here that defendant intentionally failed to perform its contract with my client, Holland Loader. It also held that that breach, quote, shafted my client, Holland Loader, and swallowed up a proud American company. Yet Judge Woods then felt constrained by the proof and held that Holland Loader had failed to prove its damages with a reasonable degree of certainty. Now there's only one issue that's presently before the Court on this appeal, and that issue is whether or not Holland has simply proven the fact of damages, not what the damages are or the quantum of damages. F.L.S.'s position on appeal is that Holland has not even proven the fact of damages. Help me understand. What exactly was F.L.S. Smith getting from Holland? He got its entire business. He got products. He got its intellectual property. Well, let's start with the products. Help me understand. They didn't seem to have any products. They didn't make any sales over an extended period of time. Your Honor, it's a— Ten years? Two or three products? Sold? Your Honor, over the last five years immediately preceding the contract, there was $1.5 million in sales. And how many contracts was that? The number of contracts, Your Honor, is not in the record. There was a number of products. There was a refurbished loader. There were certain spare parts. But the context here is really important. Only one loader, right? In ten years? So, I'm focusing on the period five years before. There were certainly— I thought the record indicates for the prior ten years there was only one sale of one loader. Is that right? That's correct, Your Honor. But— Plus spare parts. Anything else? Well, Your Honor, the context here is really important. Remember, Holland Loader was a company in Colorado that was a one-man band. It was owned and operated by a single person, Mr. Svatek. Okay, we can get to the context, but let's be sure that we understand the quantity of products sold. One loader, spare parts, what else? One loader, spare parts, and I believe there was also some tractors and trailers. And the period I'm focused on is—and it may be for the ten years prior, but certainly for the five years immediately preceding the contract, there was $1.5 million in sales. Now again, for— And am I right that pursuant—this was called an intellectual property agreement that was the acquisition of the business? Correct, Your Honor. Right? There was not a warehouse full of stuff that—or, you know, loaders, bi-directional or otherwise, that was transferred, right? It was patents and goodwill and ideas that were transferred, right? Correct. And there was also several trailers of spare parts that were transferred over. Yeah, so the word product—the word product doesn't describe machines. It describes intellectual property that could turn into actual goods that could be sold. Is that right? That's correct. That's correct. It was an intellectual property purchase agreement. So there was a number of products that had been developed that had been sold in the past. The intellectual property incorporated in those products were sold as part of this transaction. How do I—were there patents? Correct, Your Honor. Yes. Yes. And so, again, the fact here—it's the very threshold issue, right? The threshold issue is whether or not my client has even proven the fact of damages. That's a low threshold, and we know that for three different reasons. If you look at this Court's and the Courts of Appeal precedent, you look at Judge Woods' decision below, and you look at the facts, I respectfully submit that my client has proven the fact of damages. Now, how do you prove the fact of damages? All you need to do, and FLS concedes this is, you have to prove some damages. That's all you need to do. If you look at the Tractable case, this Court found that the plaintiff proved some damages when the defendant repudiated his contract. He failed to perform. He didn't buy certain energy. The Contemporary Mission case, also from this Court, very, very similar to what happened here. This Court held that there was a defendant who was supposed to promote the sale of products. The defendant didn't do that. FLS was supposed to promote the sale of the products. Judge Woods found that FLS didn't do that. Am I right in understanding, though, that to create products that could be sold, that FLS would have had to spend substantial money to develop items, to bid on items? I mean, it didn't, we have these other breaches about failing to train the sales force and so on, but it wasn't as if there were items there kind of ready to sell. It had to invest in order to develop products that would be covered by the earn-out provision. Isn't that right? They certainly had to invest, Your Honor, but if you look at the deal memo, and the deal memo was drafted by an FLS executive for the Board, was the basis of this deal, they say there's little work that needs to go into this here. There's already drawings. The products are synergistic with our existing products that we have. All we need to do is really update these drawings, spend a little bit of time, and we're off to the races. And the deal memo makes it very clear that there's very little work to be done here. They had been working with Mr. Svatek, who was the principal of Holland, for years. This was an actual question, right, the existence of damages? I believe that goes to a legal issue, de novo, Your Honor, because the— Whether the plaintiff proved with reasonable certainty that it had, in fact, been damaged? I think the fact of damages, Your Honor, I believe is a legal question. And there's Second Circuit precedent that we cite in our brief that goes to that issue. Any time you have an issue concerning damages, quantification of damages, that's a legal issue that's reviewed by this Court, de novo. One other point, Your Honor, I see I only have two minutes left. I would assert that if you look at what this Court did in the Rasevich case, the Second Circuit case, that the wrongdoer rule comes into play there. And I would assert that this case is just like Rasevich. This Court held in that case when damages are at some unassertainable amount, below an upper limit, and when the uncertainty arises from the defendant's wrong, the upper limit will be taken as the proper amount. Now there's no dispute— Does that concept apply to the amount of damages as opposed to the fact of damages? Correct. That goes to the amount of damages. We don't even get there unless we agree that the fact of damages was proven? That's correct. I don't understand how the fact of damages is something other than a fact. Your Honor, you mean how do we show the fact of damages here? You said, and correct me if I'm wrong, I thought you were urging on us that the fact of damages is a legal conclusion, and my question to you is how can the fact of damage be something other than a fact? Well, Your Honor, the Second Circuit cases we cite in our brief go to the point where if you have any issues concerning damages, the amount of damages, the fact of damages, that's a de novo issue, I believe, Your Honor, that is reviewed by this Court on a de novo basis. Is it a fact? I'm sorry? Is the fact of damage a fact or is it something else? Yes, no, I believe it's the fact of damages. Whether or not there's some injury at all is the proper threshold issue here, Your Honor. So if the judge below, and I admit this is somewhat of an unusual opinion, if the judge below says, I find as a fact that this litigant suffered no damages, why isn't that subject to clear error review just like every other fact we look at? Well, because again, Your Honor, it's a damages issue, and I think this Court has been very clear in the past that when you have issues that concern damages, those are issues that this Court looks at de novo. What basis was there, what reasonably certain basis was there for calculating damages in this case, do you think? You mean, Your Honor, once you get past the threshold issue, the fact of damages? So there are a number of things here that Judge Woods looked at with a reasonable certainty standard. Now, FLS admits that that's the wrong standard. We only had to satisfy the stable foundation, but if you look at in 2012, there's a deal memo. The deal memo says on a conservative basis, it values my client's property at $13.5 million. The problem with that is that Judge Woods seriously discounted that. He said that based on what he heard at trial, the purpose of that was to get internal approval and that it was essentially created for that purpose. That's correct, Your Honor. He discounted those figures. I mean, he did not say he rejected them, but he didn't give them much. Your Honor is exactly right, and that's exactly why the wrongdoer rule was created. For this precise situation, it cannot be that the defendant can skew the numbers. Can you manufacture numbers? Can you manufacture projections and sales? But he wasn't representing that to your client. He was representing that to a colleague in his business, and suppose he said, gee, I just love this deal. I think we're just going to break the bank with this. I can see us making millions and millions and millions of dollars over the next few years on this. Do you think that reasonably would peg the upper level of damages? I certainly believe, Your Honor, it provides a stable foundation for damages. And it's not just that. It's in 2012, 13, 14, 15. There are consistently numbers. In an internal document, and this is in the record, this is at JA 479, here's what two FLS senior executives are saying. This is three years into the earn-out period. They're talking about do these forecasts have any legs? Are they real? One executive says here, I think the Holland Products has some real possibility as no one has provided any engineering efforts since acquisition. Even one full-time employee focused on this may have a fairly quick effect. The $5 million for 2015 is backed up with some real data. They use the words backed up by real data three years into the earn-out period. Real data, I respectfully submit, is a stable foundation. We have missed opportunities. We have sales forecasts. We have R&D reports. We have documents where they're saying these are real prospects. We dropped the ball. Their words, not ours. There were folks coming to them throughout the earn-out period into 2017 wanting to buy our products, a $2 billion product. They say, we dropped the ball. They point to what a competitor was doing with the same exact property that we had. It was a portable conveyor. And they say, our competition has reached $500 million in one year. We had the same product. They did nothing with it. So I respectfully submit, Your Honor, that if you get to the quantification of damages, the record is certainly enough and sufficient to provide a stable foundation. But you don't even need to get there, Your Honor, because again, the Rasevich case provides that you accept the upper limit when the uncertainty is caused by the defendant. The problem here is there's absolutely no meaningful sales record here. They didn't sell anything. Your client didn't sell anything of any consequence before the deal. And it's very difficult to make, I mean, come up with any comparables. It wasn't really, why wasn't this essentially a new business? Your Honor, this was, and when you talk about history of sales, this was his retirement ticket. There was no need for our client to be selling the bidirectional loader of big products. $300,000 a year on average for the past five years for one person in Colorado is a substantial salary. He was only focused on spare parts. That's all he needed to do. This deal was supposed to be his golden ticket to retirement. This is a company with 50 subs worldwide, a worldwide selling force. He said, let me give you my intellectual property. I have deals all over the world I can't fulfill because I have capital constraints. You don't have capital constraints. But the contract they entered into was remarkably sketchy for something that was supposed to be a golden ticket to retirement. I mean, it just refers to commercially reasonable efforts in a general way. It affects the transfer of the intellectual property, the patents. But commercially, it didn't really have set, you have to expend a certain amount on R&D. You have to expend a certain amount on training. You have to develop it in this matter and that matter was just very, very generic. And that, as the district court pointed out, makes it very difficult to, while you may feel that these were not reasonable efforts overall or commercially reasonable, because it required the input of significant capital to develop anything. It's, you have a tough road to hoe, I think. Well, they had to use commercially reasonable efforts to develop a new product, the bi-directional loader, and they had to promote the sale of the products. As a new product, as Judge Parker's just pointing out, this is like a new business. Well, there was one new product, Your Honor. There was only one new product, was the bi-directional loader. The other products, if you look at the deal memo here, if you look at the testimony, they say this is proven technology. These products have been in use for 25 years. But didn't the- You hadn't sold any. How could it be proven technology? Well, the products had been sold going back. When my client took over the business, again, he was focused on spare parts because that's all he needed to do. That's all he needed for himself. But FLS concedes this was proven technology. They say in their record that we only need to do a little bit of work here to FLS size these products. That's their term. We need to bring them up to our standards. This was not a complete, total redo. They were going to take all the products, FLS size them, and continue selling them. There was respectfully- You have two minutes for rebuttal. You're way over. I'm sorry, Your Honor. Thank you. Good morning, Your Honor. May it please the court, Stephen M. Harnick for the appellee, FLS Schmidt. In this appeal, Holland has not cited a single case that is on point. In all of the cases on which Holland seeks to rely, the court did not question the fact of damages, focusing instead only on the calculation of the amount. This is not such a case. Rather, this is a case where the court found that there were no damages whatsoever. We submit that the closest case, indeed the case that is almost directly on point in respective damages, is this court's decision in NES Financial versus JP Morgan, where this court held, quote, the district court did not find that appellant had suffered damages of an indeterminate amount. It found that appellant had suffered either no damages at all, or that the possibility that it would suffer damages was speculative. You had an arrangement where you were going to take over and acquire the intellectual property, and you were going to use best efforts or reasonable efforts to make the, to incorporate the property into products and sell them. And the judge found that notwithstanding those undertakings, you essentially did nothing. He used a pejorative we don't often use, but he said you just shafted them. Yes, Your Honor, and Your Honor, we agree with you in some respects that this was an unusual decision, because he uses a lot of, Judge Woods did use a lot of which I say, strong language, yeah, but it's not supported by his own decision. I mean, he begins by saying that we took numerous steps, quote, to lay the groundwork for effective marketing of the acquired assets. That's at page 620. Then, my client got involved with New Zealand before they'd even signed the contract. They sent David Holland to New Zealand. When my friend, Mr. Rella, says today that it was just a matter of bringing in the products and they were ready to go, the fact was that those dozer- Did I hear you telling us that Judge Wood made findings of fact that are not supported in the record? Correct, Your Honor, yes. So, for instance, he says that we shafted them. He says that we dumped the New Zealand deal twice, maybe more, in the opinion itself, he justifies that we didn't bid on New Zealand. These were completely unrealistic timetables that they gave us. We had liquidated damages. You didn't cross appeal. We did not cross appeal because the case law doesn't provide for a cross appeal where we won below on lack of damages. However, we urge the court- Are you arguing that he was wrong in terms of finding a- We do, Your Honor. We do urge the court, and this is starting at page 16 of our brief, that the facts as found by the court do not justify the finding that we never intended to carry out the provisions of this contract. The court takes into consideration this historic downturn in the market. It mentions the Stop the Bleeding program. It finds that we did- Nonetheless, the record seems to suggest that there were inquiries received by your client about purchasing Holland Loader products, and those were not followed up on. I didn't see any reflection or in what the district court wrote that some of the products that have been sold in the past were inadequate in any way. They had to undergo this FLS-izing process, but still there was no training done, the district court seems to say, and that these sales opportunities could have been followed up on with minimal capital investment. Why doesn't that constitute a breach of the contract, as the district court found, to use commercially reasonable efforts to sell Holland products? Well, Your Honor, that's a fair question. The record actually shows that we were communicating- This is a company that has 50 offices throughout the world. The U.S., Southeast Asia, India, South Africa, Indonesia, they were all communicating with one another. They were responding to inquiries that were coming in. They were getting support from the Spokane office. There's an important- and it's mentioned in our brief- that one- Mr. Furry, Willem Furry testifies that FLS would be lucky if as much as one out of 100 inquiries turned into a sale. Given the number of inquiries and the modest gap between where the products were that have been sold in the past, albeit not in the previous decade, why isn't it reasonable to presume some form of general damages in that context, given the breach and the repeated inquiries looking for- even if it's just one out of 100 inquiries that turns into a sale, these are multimillion dollar items. Why isn't it reasonable to presume some kind of general damage in that context? Well, you know, so this gets really to the point that whether it's general damages or whether it's consequential damages, the inquiry is the same. You have to- it has to be tethered to the evidence, and it cannot be speculative, and as Judge Parker correctly noted, this is- this was a case where you had one sale of a loader in 2002. These two- And I'm pointing to evidence, and that's what I'd like you to explain. With all these inquiries in the history prior to the 10 years of sales of products and the same intellectual property and same patents and so on being- having been transferred, why weren't those inquiries a sign that sales would have- could have been made? Well, I guess the best- the best answer to that, Your Honor, is that there were no comparable sales during this entire period. We did not prevent Holland to go out with its expert or whoever- however it wanted to prove its damages to see what comparable products could have been sold during this period, this historic downturn. I mean, let me just remind the Court that not a competitor, but a major player in the same industry, Caterpillar, let go 10,000 employees at this period- during this period of time. We had- we were closing offices left and right. They could not identify one single sale of a comparable product during this entire period. In fact, the irony is that our expert found one sale, and that was the- that was the- it was related to the New Zealand deal, where the purchaser would- in 2013, when FLS decided not to go forward with New Zealand, they then decided that they would either bid out again for a dozer trap or- well, as we understood, they were going to bid it out. Then in 2015, our expert finds out that they were still looking for a dozer trap, and then they built it themselves. So this is a case that's a little bit similar to Judge Hallwell's case in the Mium Matatu case that we cited. Assume arguendo that every one of Judge Wood's findings of fact is valid. Is it your- explain to me how your adversary would not be entitled to $100 damages? Well, I mean, there are cases where you get 6 cents, you get $1, you have nominal damages, I don't know if there's a particular distinction to be made between no damages and nominal damages. $1,000. But they don't get to the fact of damages because we've already prepaid them $350,000. We gave them a $350,000 advance. So the fact of damages doesn't even start until they've exhausted the $350,000. And this is precisely the same fact situation. Wasn't it incumbent on Judge Wood to determine whether some offset was required in view of the prepayment? Well, it never came to that. The only sales, and this is only brought up in the reply brief for the first time, the only sales were these spare parts. Now, these were all of $80,000 of spare parts translated under the formula. That came to all of $8,000. So my client overpaid for those spare parts 43.75 times for those spare parts. And I bring to your honor the- But the difference is, he said there were no damages. He didn't say there were less than $350,000 in damages. I think your honor, he just didn't think that he didn't need to get into that because he just found there was no historical record. Their expert had not brought forward any evidence that during this period of time, no matter how much resource my client had devoted to this case, that they would have made a single sale. Let me point- When was the 80, when were the spare parts sold? Sometime between 2012 and 15. I don't have an exception. During the life of the contract. During the life of the contract, yeah. Why wasn't that a predicate for some damages? Because- It may not have been the kind that, or the magnitude they were thinking about, but that's different from no damages at all, which is what the judge found. Well, I don't know. He didn't reflect- Why isn't it reasonable that if they made $180,000 sale of spare parts with all of these worldwide resources, you could have made another one? Your Honor, maybe they could have made another one, but they only had 8,000 in- 8,000 or 80,000? Well, 80,000 of spare parts translates to $8,000 against the advance payment because it's 10%. You're right, a dollar is a dollar. Yeah. They said no damages. What's wrong with that reasoning? They only brought this up now for the first time on this appeal. It's something that they didn't bring to his attention. I get that, but let's hear your response on the substance. Well, my response is that I refer the court to Upper Deck at Brakey, which would be the exact same, I mean, in this context, exact same facts. I don't want you fighting cases. Tell me why you think that would not be a predicate for some damage, and then you can refer us to precedent, please. Thank you, Your Honor. As I tried to express, the fact of damages does not come into play until you get to the first dollar above $350,000. Then the cradle paragraph of the opinion should have said something along the lines, he's already been paid $350,000, so he's not due anymore. Yeah. I mean, I don't think that would have a bearing . . . He's not due the $8,000 because he's already been paid it, but that's not what the judge said. Right. Well, the appellant didn't even bring this up in the briefing. If I just have one second, I'll just respond to three points that were made by my friend, Mr. Rella. One is he mentioned something about $1.5 million in the last five years. I don't think there's anything in the record about sales of $1.5. He says that, Judge Carney, you would mention goodwill. Goodwill was not part of what was sold here. And what was the last point? That there were no meaningful sales . . . Yeah, just very quickly on the wrongdoer rule, I would just point to the Mertz case and the cap, where the judge says no matter, even if you do look at a cap and even if you were to get wrongdoer rules, you still have to prove your damages, which they did not do. We'll rely on the brief. Thank you very much. Thank you. We'll hear the rebuttal. Thank you, Your Honor. Was there any license income from the patents that were exchanged, that were transferred? That's not in the record, Your Honor. There's no record of patent license income. And in the run-up to the transaction, was your client getting patent royalties from the patents that were transferred? That's not in the record either, Your Honor. The only income, as I stated, and it is in the record, it's at JA-242, that there were $1.5 million in sales in the previous five years. What is being transferred other than your client's obligation to go to work and to try to make sales? There were patents. There were designs. There were designs that he had drawn. Some were computerized. Some were not. They just had to be updated. There were spare parts. There was his idea for the bi-directional loader that they quantified as a $25 million product that he brought over and gave to FLS. So that's now an FLS product. I'm sorry. When you say they quantified, that's in the deal memo. That's not in the agreement itself. Isn't that correct? It's not in the agreement, but there are plenty of documents in the record, Your Honor, where they're doing projections and they're looking for R&D, and they say the price of that product, the bi-directional loader, will be $25 million. Now, that's Mr. Svatek's idea. It's a novel idea. He brought that over to FLS. So now that's FLS's idea, and they can move forward and run with it. And FLS paid $750,000 for this transfer overall, right? They paid $700,000, Your Honor. And remember, Your Honor, an important point is in the deal memo, which was done by an FLS executive for the FLS board, was relied on and approved by the FLS board, they quantified it at a net present value analysis of the value of the property that was coming over and valued it at $13.5 million. The district court said that the deal memo could not, the numbers could not be substantiated or justified. That's true. That's a finding of fact. But, Your Honor, that is true. But, again, that is precisely why the wrongdoer rule was created. You can't hold that against Holland, the fact that they're manufacturing You just have not substantiated to me, at least, that that finding is clearly erroneous. Well, I mean, it's clear in the record that they manufacture the numbers. There's no question about that whatsoever. I made a finding about it. Why was it clearly erroneous, that finding? The fact that he made a finding that the deal memorandum lacked any established or reliable indicators of accuracy and that it could not be substantiated or justified. Why is that finding clearly erroneous? Well, because this was a year that had been negotiated for four years. There was plenty of data. They were asking my client for sales numbers, for product numbers, for margin numbers. And even a couple years later, there's 61 opportunities worth $150 million. There's plenty of e-mails where they're passing up opportunities. The record is robust with respect to plenty of opportunities that they just passed up. So the fact that they're making these projections in a deal memo, they're actually borne out. If you look at all the opportunities, $150 million in opportunities, they only had to get a very small fraction of that and the $4 million earn out would have been achieved here. And again, with respect to calculating damages, you don't need to wade through the evidence because of Rasevich. And the last thing I'll say, Your Honor, just on the fact of damages, they cite to one case in their brief. It's the JP Morgan case, the NES JP Morgan case. I would urge, Your Honors, if you juxtapose the language in that case with the language in Judge Woods' decision, it's very, very clear. Judge Woods did not find that my client failed to show the fact of damages. How much damages are you urging us that your client? Well, the cap in the contract is $4 million. There was 350 paid, so it's 3.65 million, which, again, is the upper limit under Rasevich. So, again, in JP Morgan, the only case they cite, the court there found that NESF had suffered no damages at all. They hold that NESF has offered insufficient evidence of any damages. Look at what Judge Woods does. He's struggling to quantify damages. He says there's insufficient evidence on the basis of which the court may calculate with sufficient certainty. He says the little historical data and evidence in connection with past sales of Holland Products also fails to provide a baseline by which to calculate damages. He did not find that we did not establish the fact of damages. He held that we did establish the fact. We did not establish the quantum. And when he looks at the quantum, he admittedly uses the wrong standard. Thank you very much, Your Honors. Thank you. I appreciate it. It was a reserved decision. Thank you. Thank you both. Thank you.